28

United States District Court
Southern District of Texas
FILED

NOV 0 7 2000

Michael N. Milby
Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOSE CUELLAR | § | |
| | § | |
| VS. | § | CAUSE NO. B-99-195 |
| | § | |
| THE CITY OF SANTA ROSA, | § | |
| AND OFFICER JACOB L. BORJAS, | § | |
| INDIVIDUALLY AND IN HIS | § | |
| OFFICIAL CAPACITY | § | |

### CITY DEFENDANTS' FIRST AMENDED
### MOTION TO STRIKE ELISEO GARZA ROBLES'
### TESTIMONY AS PLAINTIFF'S SUMMARY JUDGMENT PROOF

May It Please the Court:

NOW COMES the CITY OF SANTA ROSA and JACOB BORJAS, Individually and Officially, (hereafter "CITY DEFENDANTS") and file this First Amended Motion to Strike certain summary judgment evidence contained in Plaintiff's responsive filings to the CITY DEFENDANTS' Motion To Dismiss or For Summary Judgment.

### SUMMARY OF ARGUMENT

CITY DEFENDANTS object to the Court's consideration of certain portions of Plaintiff's supplemental summary judgment evidence, in response to the dispositive motion filed by CITY DEFENDANTS. See Plaintiff's First Supplement to Their Motion to Continue Summary Judgment Hearing and Opposition to Defendants' Motion for Summary Judgment and To Stay All Discovery.

City Defendant's First Amended Motion To Strike
Plaintiff's Summary Judgment Evidence of Eliseo Garza Robles          Page 1

Such evidence, as more specifically outlined below, does not satisfy the requirements of the Federal Rules of Civil Procedure or of the Federal Rules of Evidence and is, therefore, objectionable. Consequently, such evidence should be stricken and ignored by the Court in evaluating the dispositive motion before the Court.

## PROCEDURAL HISTORY

THE CITY DEFENDANTS filed its Motion to Dismiss or for Summary Judgment (hereafter "dispositive motion") on or about May 25, 2000. It asserts, among other things, DEFENDANT BORJAS' entitlement to qualified immunity.

Plaintiffs filed their Motion to Continue Summary Judgment Hearing and Opposition to Defendant's Motion for Summary Judgment and to Stay All Discovery (hereafter "Response Brief") on June 13, 2000.

Shortly thereafter, on June 29, 2000, Plaintiff filed a Supplement (hereafter "Supplement") to his Response Brief. The Supplement included the affidavit testimony of Eliseo Garza Robles, which is intended as additional summary judgment proof responsive to the merits of the dispositive motion filed by the CITY DEFENDANTS.

## STATUS OF DISCOVERY

The Court should further be apprized that since the filing of the initial dispositive motion, the parties have, by agreement, been engaged in deposition discovery. Plaintiff has been allowed

to depose DEFENDANT JACOB BORJAS, and CITY DEFENDANTS have deposed various alleged witnesses to the incident.  Despite not being a fact witness as to underlying factual background made the basis of this suit, Eliseo Garza Robles has been deposed as well. Consequently, the parties have had access to deposition discovery and dispositive matters are ripe for a ruling on their merits by the Court.

In this regard, based on matters adduced during deposition discovery, CITY DEFENDANTS hereby file this First Amended Motion to Strike Plaintiff's supplemental summary judgment proof, as more specifically outlined below.

## LEGAL ARGUMENT & ANALYSIS

1.  **Eliseo Garza Robles' Testimony attributes statements and acts to Jacob Borjas That Should Be Stricken by this Court Because the Testimony is Unreliable and Garza Robles Did Not Have Personal Knowledge as Required by Rule 56 (e) and F.R.E. 602.**

Throughout the affidavit testimony of Eliseo Garza Robles, Plaintiff purports to introduce evidence attributing certain testimony and acts to DEFENDANT JACOB BORJAS.  In doing so, Eliseo Garza Robles' affidavit implies that he has the requisite "personal knowledge" to support the above-referenced statement and the facts, which as he states in his affidavit are "true and correct."  See Affidavit of Eliseo Garza Robles attached as Exhibit "A" (hereafter "affidavit").

Garza Robles' affidavit implies that DEFENDANT JACOB BORJAS used excessive force, and profane language in arresting him on or about March, 1998. Garza's affidavit also mentions an incident one month prior to his arrest where he claims JACOB BORJAS stated he loved to arrest persons, who avoided arrests, at gun point:

> On one occasion, approximately one month before my arrest, I went to the ex-mayor's welding shot to have some steel welded for me. While I was there, I overheard Jacob Borjas tell ex-Mayor Marroquin that the loved it when people avoided his stops and that he loved to chase people or do pursuits. He also said that he loved to take people out at gun point, his exact words being "A punto de pistola en la cabesa." The only thing the mayor did was laugh it off.

See Exhibit A.

Under Rule 56 (e) "supporting and opposing affidavits shall be made on **personal knowledge,** shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to matters stated therein. Caselaw is clear in that the "personal knowledge" requirement precludes affidavits based on information and belief. See *United States vs. Crispen*, 622 F. Supp. 75, 80-81 (N.D. Ill. 1985). Moreover, extrinsic evidence may be used to establish an affiant's lack of personal knowledge. *See Flair Broadcasting Corp. v. Powers*, 733 F.Supp. 179, 182-83 (S.D.N.Y. 1990) (striking affidavit because affiant's deposition established lack of personal knowledge).

The deposition testimony of Garza Robles establishes that he lacks the requisite personal knowledge for the basis of the above-

City Defendant's First Amended Motion To Strike
Plaintiff's Summary Judgment Evidence of Eliseo Garza Robles          Page 4

referenced testimony.  For instance, Garza Robles admitted that he had been in contact with JACOB BORJAS on only two occasions: 1) At Marroquins's welding shop a month prior to his arrest and 2) When was arrested by JACOB BORJAS in March, 1998. See Exhibit B, p. 22. However, it is clear that Garza Robles does not know who JACOB BORJAS is, and therefore, whether he was present on either occasion.  He simply states a gentleman by the name of "Marroquin" attributed the statement and act to JACOB BORJAS.  See Exhibit B, pp. 24-25.

In fact, Garza Robles concedes that he did not know whether JACOB BORJAS made the statement at the welding shop. See Exhibit B, p. 22.  He states that at the welding shop he did not notice the name on tag worn by the police officer.  See Exhibit B, p. 22-23. Furthermore, Garza Robles admits that he heard no one refer to this person as "Borjas."   See Exhibit B, p. 24.  Garza Robles also states that it could have been another police officer that made the statement which he attributes to JACOB BORJAS.  See Exhibit B, p. 23.  Garza Robles admits that he has no firsthand knowledge of ever being present with Borjas at Marroquin's shop.  See Exhibit B, p. 25.

With respect to his arrest, Garza Robles further concedes that he did not read the name on the tags of the arresting officers so as to identify the officer. See Exhibit B, p. 23.  Nor did any officer ever refer to anyone as "Jacob" or "Jacob Borjas" that

evening. See Exhibit B, p. 23. Garza Robles admits that he does not know what Jacob Borjas looks like, and for that matter, admits that he truly does not know who made the statement at the welding shop or his arrest either. See Exhibit B, p. 23-24.

Therefore, it is clear that Garza Robles' testimony is not "true and correct." Rather, his testimony is supported by nothing more than mere "information and belief" and not personal knowledge. Consequently, his testimony is unreliable and cannot be considered by this Court in determining the merits of CITY DEFENDANTS' Motion to Dismiss. Due Process requires, at minimum, reliable summary judgment proof that satisfies the requisite evidentiary standards of reliability and proof.

Therefore, the above-referenced testimony of Garza Robles should be stricken, and it should not be considered in reference to whether Plaintiff have created a material issue of fact.

## 2. Plaintiff Has Not Produced Sufficient Evidence to Overcome Borjas' Entitlement to Qualified Immunity.

Because of the inadequacy of the summary judgment proof presented by Plaintiff, even after defense counsel agreed to go forward with discovery, Plaintiff is unable to provide sufficient competent summary judgement evidence to overcome DEFENDANT BORJAS' entitlement to qualified immunity. The proof provided by Plaintiff is insufficient as a matter of law to create a fact issue on the matter of qualified immunity. Therefore, in connection with

City Defendant's First Amended Motion To Strike
Plaintiff's Summary Judgment Evidence of Eliseo Garza Robles          Page 6

the dispositive motion filed by the CITY DEFENDANTS, as well as assertion of qualified immunity by DEFENDANT BORJAS, the Court should find for BORJAS based on his entitlement to qualified immunity.

## CONCLUSION & PRAYER

THEREFORE, based on the foregoing reasons, CITY DEFENDANTS request that the Court strike Eliseo Garza Robles' above-referenced testimony attached to Plaintiff's Supplemental motion for continuance and opposition.

CITY DEFENDANTS further request and reargue the relief sought in their dispositive motion previously filed, namely that DEFENDANT BORJAS be granted his qualified immunity and that Plaintiff's lawsuit be dismissed in its entirety.

Finally, CITY DEFENDANTS request that the Court grant any such further relief, at law or in equity, to which they be entitled.

SIGNED this 7th day of November, 2000.

Respectfully submitted,

**DENTON, McKAMIE & NAVARRO**
a Professional Corporation
Bank of America Building
222 E. Van Buren, Ste. 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Facsimile)

By: _____
RICARDO J. NAVARRO
Attorney In Charge
So. Dist. ID No. 5953
MAURO F. RUIZ

City Defendant's First Amended Motion To Strike
Plaintiff's Summary Judgment Evidence of Eliseo Garza Robles          Page 7

So. Dist. ID No. 23774
ATTORNEY FOR CITY DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this document has been sent by Certified Mail/Return Receipt Requested unless otherwise indicated, to the person(s) listed below on this 7th day of November, 2000.

Mr. Carlos Quintana          **By CMRRR No. 7000 1670 0000 0475 2850**
LAW OFFICES OF CARLOS QUINTANA
1302 Neuhaus Tower
McAllen, Texas 78501


RICARDO J. NAVARRO
MAURO F. RUIZ

*City Defendant's First Amended Motion To Strike
Plaintiff's Summary Judgment Evidence of Eliseo Garza Robles*          Page 8

EXHIBIT " _A_ "

CVisPDF – www.fesvio.com

| STATE OF TEXAS | § | |
|---|---|---|
| | § | **AFFIDAVIT** |
| COUNTY OF HIDALGO | § | |

BEFORE ME, the undersigned authority, personally appeared ELISEO GARZA ROBLES, a person known to me who first duly sworn upon his oath, did depose and say:

"My name is ELISEO GARZA ROBLES, I am over twenty years of age, have never been convicted of a crime involving moral turpitude, I am fully competent to make this affidavit and have personal knowledge of the matters set forth herein. Each of the facts as set forth herein are true and correct.

My name is Eliseo Garza Robles. I am 35 years of age. I am employed as a driver for Cano Produce in Harlingen, Texas. I am also a contract musician. I reside at 213 Jesus T. Avila, Santa Rosa, Texas.

On or about March, 1998 at around 3:00 a.m. I was on my way home from the Flamingo Ball Room in Combs,Texas, where our band had played that night. As I got into Santa Rosa I drove down to Jesus T. Avila Street that leads to my house. When I got to the intersection of Jesus T Avila and Highway 106 I noticed two Santa Rosa police units. One was traveling south and the other north. The two followed me down the street to my house. I noticed the over head lights of one police vehicle come on. The lights were turned on a very short distance from my house. I proceeded to the driveway to my house since it was three house down from where they turned the lights. I drove into my driveway. As soon as I parked, the officers came running to me with their guns drawn. Jacob Borjas grabbed me by my hair, called me a mother fucker and put his gun to my head and yanked me out of the car onto the ground. The other officers also had their guns to my head. They put me on the ground and one officer put his knee on the back of my neck the other on my back, forcing their weight on me. I kept asking why I was being arrested and Officer Jacob Borjas kept telling me to shut up. That I had no rights. Officer Jacob Borjas and the two other officers picked me up then took me out of the driveway onto the street where officer Jacob Borjas again threw me to the ground and placed his knee on the back of my neck. I asked over and over why I was being arrested and he continued to tell me to shut up. He kept insisting that I was drunk and I told him that the band and I were playing at the Flamingo ball room and that I didn't drink when I play. He said that my eyes were red and that I looked like I had been drinking. I told him my eyes were red from the smoke in the bar. The other officers were holding my hands behind my back when I felt a hit to the back of my head. It came from officer Jacob Borjas who had his knee on the back of my neck. The officers then arrested and handcuffed me and put me in a police unit. As I was in the police car I noticed that Officer Jacob Borjas got in my car and started it and backed it up into the street then put the keys on the seat as if he had stopped me outside my property. My car was left there and I was taken to the La Feria plice department jail where I was booked. When we were at the police station in La Feria I asked Jacob Borjas why I was stopped and arrested. He replied saying that at 3:00 a.m. in the morning they have the right to stop whom ever they want. He also said that it was my lucky day because he could have taken me to Brownsville, where it would have been



**EXHIBIT " A "**

worse for me.  I was charged with public intoxication.  I told Borjas that I was willing to do a breathalyzer test.  But he refused to give me one.  I was released at around 6:00 p.m.  The La Feria police department released me.  I called my wife who was worried to come pick me up. Although I do not remember the names of the other officer, I am sure that their names are part of the arrest report that Officer Jacob Borjas made.

On one occasion, approximately one month before my arrest, I went to the ex-mayor's welding shop to have some steel welded for me.  While I was there, I overheard Jacob Borjas tell the ex-Mayor Marroquin that he loved it when people avoided his stops and that he loved to chase people or do pursuits.  He also said that he loved to take people out at gun point, his exact words being "A punto de pistola en la cabesa".  The only thing the mayor did was laugh it off.

FURTHER AFFIANT SAYETH NOT."

*Eliseo Garza*
ELISEO GARZA ROBLES

SUBSCRIBED AND SWORN TO BEFORE ME, by the said **ELISEO GARZA ROBLES**, on this 20 day of June , 2000 to certify which witness my hand and official seal.

{SEAL}

Notary Public in and for the
State of Texas

worse for me.  I was charged with public intoxication.  I told Borjas that I was willing to do a breathalyzer test.  But he refused to give me one.  I was released at around 6:00 p.m.  The La Feria police department released me.  I called my wife who was worried to come pick me up.  Although I do not remember the names of the other officer, I am sure that their names are part of the arrest report that Officer Jacob Borjas made.

On one occasion, approximately one month before my arrest, I went to the ex-mayor's welding shop to have some steel welded for me.  While I was there, I overheard Jacob Borjas tell the ex-Mayor Marroquin that he loved it when people avoided his stops and that he loved to chase people or do pursuits.  He also said that he loved to take people out at gun point, his exact words being "A punto de pistola en la cabesa".  The only thing the mayor did was laugh it off.

A friend of mine later told me that I should file a complaint against the officers, but I did not feel that anything would be done if I did, especially since the mayor himself was laughing at what Borjas had told him.

FURTHER AFFIANT SAYETH NOT."

_Eliseo Garza_
ELISEO GARZA ROBLES

SUBSCRIBED AND SWORN TO BEFORE ME, by the said **ELISEO GARZA ROBLES**, on this 20· day of _June_ , 2000 to certify which witness my hand and official seal.

{SEAL}

Notary Public in and for the
State of Texas

VERONICA MARTINEZ
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
05-13-2004



CSdsPDF – www.fastio.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

FLOR ESTELLA BRIONES,          X

INDIVIDUALLY AND AS            X

REPRESENTATIVE OF THE          X

ESTATE OF JOSE CUELLAR         X

                               X    C.A. NO. B-99-195

VS.                            X

                               X

THE CITY OF SANTA ROSA,        X

ET AL                          X

ORAL DEPOSITION OF

ELISEO GARZA ROBLES

AUGUST 24, 2000

ORAL DEPOSITION OF ELISEO GARZA ROBLES, produced as a witness duly sworn by me at the instance of the DEFENDANTS, taken in the above styled and numbered cause on AUGUST 24, 2000, before MAUREEN STINGLEY, Certified Shorthand Reporter No. 691 in and for the State of Texas, at the offices of Bryant & Stingley, Inc , 2010 East Harrison, Harlingen, Texas.

---

Page

INDEX

|                                                          | PAGE |
|----------------------------------------------------------|------|
| Appearances .....................................        | 2    |
|                                                          |      |
| ELISEO GARZA ROBLES                                      |      |
| Examination by Mr. Ruiz .........................        | 4    |
| Examination by Mr. Quintana .....................        | 46   |
| Examination by Mr. Ruiz .........................        | 56   |
|                                                          |      |
| Errata Sheet ....................................        | 62   |
|                                                          |      |
| Signature Page ..................................        | 63   |
|                                                          |      |
| Reporter's Certificate ..........................        | 64   |

Attached to the end of the transcript: Stipulations

EXHIBITS

|        |                                          | PAGE   |
|--------|------------------------------------------|--------|
| NUMBER | DESCRIPTION                              | MARKED |
| 1      | Affidavit of Eliseo Garza Robles ........| 8      |
| 2      | Uniform Traffic Ticket and Complaint ....| 26     |
| 3      | Jail/Booking Card .......................| 39     |
| 4      | Judgment, The State of Texas v.          |        |
|        | Eliseo Garza ............................| 45     |

---

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFF:

CARLOS QUINTANA

LAW OFFICE OF CARLOS QUINTANA

Neuhaus Tower, Suite 1302

200 South Tenth Street

McAllen, Texas  78501

COUNSEL FOR DEFENDANTS:

MAURO F. RUIZ

DENTON, McKAMIE & NAVARRO

Bank of America Building

222 East Van Buren, Suite 405

Harlingen, Texas  78550

ALSO PRESENT:

Marisela Bracchini, Interpreter

---

Page

1        ELISEO GARZA ROBLES,

2    having been duly sworn, testified through the duly

3    sworn interpreter as follows:

4            EXAMINATION

5    BY MR. RUIZ:

6        Q. Good morning, Mr. Garza.  I had spoken to you

7    earlier in the week, but I'm going to go ahead and

8    reintroduce myself to you.  My name is Mauro Ruiz, and

9    I represent Corporal Jacob Borjas --

10       A. Uh-huh.

11       Q. -- and the City of Santa Rosa, Texas.  What

12   we're going to do today is to elicit your testimony

13   regarding an incident you had, according to your

14   affidavit, March of 1998.

15           THE INTERPRETER: March the 10th, you

16   said?

17           MR. RUIZ: No, regarding an incident.

18       Q. According to your affidavit.  What we want to

19   find out basically is the incident involving you and

20   Corporal Jacob Borjas which you discussed in your

21   affidavit.  Mr. Garza, have you ever given a deposition

22   before?

23       A. No.

24       Q. Have you ever been involved in any court

25   proceedings?

---

Case 1:99-cv-00195  Document 28  Filed in TXSD on 11/07/2000  Page 15 of 29

Page 5

1   A. No.

2   Q. What we're going to -- your testimony that

3  you're about to give is as if we're giving it inside

4  court.

5   A. Okay.

6   Q. And that's why they made you take an oath prior

7  to beginning the deposition.  From now on, though, I

8  need for you to answer in a clear voice, and I need for

9  you to say yes or no whenever I ask you a yes-or-no

10  question so that the court reporter can take everything

11  down and our interpreter can interpret it.

12   A. Okay.

13   Q. Mr. Garza, can you state your full name for the

14  record, please?

15   A. Eliseo Garza Robles.

16   Q. Do you have any middle names -- do you have a

17  middle name?  I'm sorry.

18   A. No.

19   Q. Do you have any nicknames?

20   A. No.

21   Q. Okay.  What is your date of birth?

22   A. 9-30-64.

23   Q. Okay.  And where do you live right now?

24   A. In Santa Rosa, Texas.

25   Q. Could you provide us with your physical

Page 6

1  address, please?

2   A. 213 Jesus T. Avila.

3   Q. And how long have you resided at that address?

4   A. Six years.

5   Q. Is that also your mailing address?

6   A. No.  It's another one.

7   Q. Could you provide us with that address, please?

8   A. It's P.O. Box 1434, 78593.

9   Q. Where are you currently employed, Mr. Garza?

10   A. Cano's Brothers.

11     MR. RUIZ: "Produce," I think.

12   A. Cano's Produce, Cano's Produce.

13   Q. And in what capacity do you work at Cano's

14  Produce?

15   A. I'm a chauffeur.  I'm a driver.

16   Q. Did you say you were a truck driver?

17   A. Uh-huh, yes.

18   Q. And how long have you been working there?

19   A. 12 years.

20   Q. Okay.  Are you married, Mr. Garza?

21   A. Yes.

22   Q. And what is your wife's name?

23   A. Gorgonia Martinez.

24   Q. Do you have any children?

25   A. Yes.

Page

1   Q. How many children do you have?

2   A. Two.

3   Q. What are their names, please?

4   A. Eliseo Garza, Jr. and Jorge David.

5   Q. Besides your work for Cano Produce, do you ha

6  any other employment?

7   A. I also work with music.

8   Q. And what is it that you do with music?

9   A. Drums, the drums.

10   Q. Okay.  Do you play with a group?

11   A. Yes.

12   Q. And what is the name of that group?

13   A. Invasion Nortena.

14   Q. And how long have you been working with this

15  group?

16   A. Seven years.

17   Q. Have you worked with any other groups?

18   A. Yes.

19   Q. Which group is that, or what groups are those?

20   A. Carlos y Jose, Michael Salgado, also, Eliseo

21  Robles.  There's a group that is called like that,

22  Invasion Nortena.

23   Q. Okay.  Mr. Garza, based on this affidavit which

24  you provided, this testimony, when was the last time

25  you had a chance -- I'm sorry.  Strike that question.

Page

1  Can you read English?

2   A. No.

3   Q. Can you read in Spanish?

4   A. Yes.

5   Q. Up to what grade level did you go to in school?

6   A. Fifth grade in Mexico.

7   Q. Okay.  Do you remember signing a piece of

8  paper, this piece of paper that I presented to you,

9  that I have?

10   A. Yes.

11   Q. If you look at your copy, the second page has a

12  signature of Eliseo Garza.  Is that your signature?

13   A. Yes.

14   Q. On the third -- there's a third page to it.

15  That one also has a signature saying Eliseo Garza.  Is

16  that your signature, as well?

17   A. Yes.

18   Q. Okay.

19     MR. RUIZ: I would like to mark this as

20  Exhibit No. 1, please.

21     (Garza Exhibit No. 1 was marked)

22   Q. And you understand that this paper represents

23  your testimony?

24   A. Yes.

25   Q. Okay.  According to your affidavit, Mr. Garza,

Case 1:99-cv-00195  Document 28  Filed in TXSD on 11/07/2000  Page 16 of 29

Page 9

1 in March 1998, you had -- you were on the way home from
2 playing at the Flamingo Ballroom; is that correct?
3    A. Yes.
4    Q. Okay. You said it was approximately at 3:00 in
5 the morning.
6    A. Yes.
7    Q. Had you been playing with Invasion Nortena
8 during that night?
9    A. Yes.
10    Q. Which road did you take from the Flamingo
11 Ballroom in Combes, Texas, to Santa Rosa? Do you
12 remember?
13    A. It was 107.
14    Q. Okay. And how far is Santa Rosa from the
15 Flamingo Ballroom?
16    A. 20 minutes.
17    Q. Okay. Had you traveled that road before?
18    A. All the time.
19    Q. Do you go through any other cities or small
20 towns on the way to Santa Rosa?
21    A. That day, it was Combes only.
22    Q. Okay. According to your testimony, you got to
23 the Jesus T. Avila Street and Highway 106; is that
24 correct?
25    A. Yes. It was 106.

Page 10

1    Q. I'm sorry, my fault. What kind of car were you
2 driving during that time?
3    A. It was a Toronado car.
4    Q. Is that an Oldsmobile?
5    A. Yes.
6    Q. Okay. What year was that car, sir?
7    A. '81.
8    Q. It says that once you got to that intersection
9 of 106 and Jesus T. Avila you noticed two Santa Rosa
10 police units. Could you tell me whether the units were
11 cars or vans, or what type of units were they?
12    A. Cars.
13    Q. And were there any other persons driving with
14 you as passengers that day?
15    A. No.
16    Q. You stated that one of the police units was
17 traveling south and the other was driving north. What
18 road were they on?
19    A. On 106.
20    Q. So Highway 106 runs north/south, then?
21    A. Yes.
22    Q. Okay. You state that the two followed you down
23 the street to your house. Did at any point -- one of
24 the units had to have turned around for them to have
25 followed you; is that correct?

Page 1

1    A. Yes.
2    Q. So were you traveling north or south?
3    A. North.
4    Q. Okay. So then the other two police units were
5 also driving north, following you, correct?
6    A. Yes.
7    Q. Okay. Would you know why one of the police
8 officers decided to come back and follow you that
9 night?
10      MR. QUINTANA: Objection; form,
11 speculation.
12    A. No.
13    Q. Okay. Were you ever told by the police
14 officers why it was that they followed you?
15    A. They told me because it was 3:00 in the
16 morning.
17    Q. Okay. It says that you noticed the overhead
18 lights of one police vehicle come on. Which police
19 vehicle turned its lights on? The first one that was
20 following you or the second one that was following you?
21    A. It was the first car.
22    Q. Where was that car -- was that car parked when
23 you first saw it?
24    A. They were both of them parked, like this.
25    Q. And then what?

Page 1

1    A. They were both parked on 106, and I passed
2 right in the middle through Jesus T. Avila.
3    Q. Okay, so they were not traveling north or
4 south; they were just parked, correct?
5    A. Yes, but on the highway.
6    Q. Okay. And what you're trying to say is that
7 one police car was pointing north parked and another
8 one was pointing south while it was parked, as well?
9    A. They were stopped so that I could pass.
10    Q. Okay. Where were they -- can you explain to us
11 where it was that you were that you had to go through
12 the middle?
13    A. Jesus T. Avila.
14    Q. So before getting to this Jesus T. Avila
15 Street, you had to pass in between the two police cars
16 is that correct?
17    A. Yes.
18    Q. Now, when -- you said you were driving north,
19 correct?
20    A. Uh-huh, yes.
21    Q. And that you had to pass -- that you passed --
22 you must have passed at least one police car, then,
23 correct, before turning onto Jesus T. Avila?
24    A. No.
25    Q. Okay. When you got to Jesus T. Avila Street,

Case 1:99-cv-00195   Document 28   Filed in TXSD on 11/07/2000   Page 17 of 29

Page 13

1   did you turn right or left?
2   A. To the left.
3   Q. Okay. And as you turned to the left, were the
4 police cars still parked?
5   A. On 106, yes.
6   Q. Okay, were they on the shoulder of 106?
7   A. No, they were on top of the lane.
8   Q. Okay. And how many lanes are there on 106?
9   A. Two coming and going.
10   Q. Okay. And were they on the right -- were they
11 both on the right-hand lanes of each direction?
12   A. Yes.
13   Q. Okay. So they were not in the middle -- in the
14 fast lane in either of the directions, correct?
15   A. Yes.
16   Q. So how far -- so when you turned onto Jesus
17 Avila Street, how far did you go before you noticed
18 that they were following you?
19   A. One block.
20   Q. Okay. How many blocks is it from Highway 106
21 to your house on Jesus T. Avila?
22   A. It's three homes.
23   Q. Okay. But how many blocks?
24   A. One, half.
25   Q. Okay, so your house is very close to

Page 14

1 Highway 106?
2   A. Yes.
3   Q. Okay. But you said that it almost took
4 them one -- it took you a block or you traveled a block
5 when you noticed that the police were following you.
6 Wouldn't you have passed your house by then?
7   A. No.
8   Q. So you noticed that they were following you
9 prior to reaching your house?
10   A. Yes.
11   Q. Okay. And your house is -- what number house
12 is it from Highway 106?
13   A. The third.
14   Q. Okay. So in getting to your home that evening,
15 you necessarily had to pass two other homes; would that
16 be correct?
17   A. Yes.
18   Q. Now, is your house on the right or left-hand
19 side of Jesus T. Avila?
20   A. Left.
21   Q. Are there any houses on the right-hand side of
22 Jesus T. Avila?
23   A. Yes.
24   Q. Okay. Do you know your neighbors in that area?
25   A. Yes.

Page 15

1   Q. Okay. Who is your neighbor directly to your --
2 if you're looking at your house from the street --
3 directly to your left of your house?
4   A. Juan Badillo, Juan Badillo.
5   Q. Do you have a neighbor on the right side of
6 your home?
7   A. At that time it was Noe Perez, but he is no
8 longer there.
9   Q. Does Mr. Badillo still live there?
10   A. Yes.
11   Q. Okay. Do you have any neighbors across the
12 street from you, directly across the street from you?
13   A. Yes.
14   Q. And who may those be?
15   A. Erasmo Garza. The others I only know by their
16 first name. His name is Placido.
17   Q. Is Erasmo Garza related to you?
18   A. No.
19   Q. Okay. What are the other -- what other
20 neighbors do you have that live on the left side of
21 Jesus T. Avila between your house and the highway?
22   A. It's Erasmo and Placido and Rey.
23   Q. What is Rey's last name?
24   A. I don't know it.
25   Q. Okay. But I thought that Erasmo Garza and

Page 16

1 Placido lived across from you, across the street from
2 you.
3   A. Yes, they live across the street from me.
4   Q. Okay, and on your side of the street, are there
5 any other homes, or do you have any other neighbors
6 other than Juan Badillo between your house and the
7 highway?
8   A. No, that's it.
9   Q. Were any of these people present on the night
10 that you were pulled over by these police officers?
11   A. No.
12   Q. Were there any other people present that
13 evening who may have witnessed when you were pulled
14 over by the police?
15   A. No.
16   Q. Did your wife come out and see you that
17 evening?
18   A. No.
19   Q. Was she there that night at your home?
20   A. Yes.
21   Q. What about your children? Did they see you
22 that evening when you got pulled over?
23   A. No.
24   Q. Do you know why not?
25   A. They were asleep.

## Page 17

1    Q. Okay. Do you have any other family members
2 that live with you at your home?
3    A. No.
4    Q. Okay. You said that the lights were on,
5 correct, from the police car?
6    A. Yes.
7    Q. Were they turned on when you got pulled over?
8    A. They turned them on on the second house.
9    Q. Okay. Now, were you stopped right in front of
10 your house?
11    A. Yes.
12    Q. Okay. So did you park inside your driveway,
13 sir?
14    A. Yes.
15    Q. Were the lights still turned on when you
16 reached your driveway?
17    A. Yes.
18    Q. Okay. Were any sirens turned on?
19    A. No. The first car, he only honked at me. That
20 was it.
21    Q. Okay. Did he speak to you through any speaker
22 or anything like that?
23    A. No.
24    Q. Okay. Do you remember whether you had your
25 windows rolled up or rolled down that evening?

## Page 18

1    A. Rolled down.
2    Q. Were there any other cars parked in your
3 driveway that day?
4    A. Yes.
5    Q. Okay, whose car -- how many cars were there?
6    A. There was one. It belonged to my wife.
7    Q. Okay, and what kind of car was that?
8    A. It's a mini van.
9    Q. So you said that you were able to reach your
10 driveway, and you parked; is that correct?
11    A. Yes.
12    Q. Okay. Did you get out of your car?
13    A. They made me get down.
14    Q. Okay. You said that you saw the officers
15 running to you with their guns drawn. Can you describe
16 that for me?
17    A. Yes.
18    Q. Go ahead.
19    A. One of them got down from his car, and he got
20 in front of me, and he pointed like this with his gun,
21 and he said, "Get out of the car, mother fucker." He
22 said it like that to me. And then I wanted to get down
23 from the car by myself, but he pulled me from my hair,
24 and he threw me down on the grass there on my yard.
25    And then the two of them -- because

## Page 1

1 another officer came, and they took me to the highway,
2 and there, they put the handcuffs on me. They put the
3 gun to my head. Then they put me into the police car.
4 Then Jacob went and turned on my car, and he pulled it
5 out of my property.
6    Q. Okay. You said -- who was the first one that
7 pointed the gun at you that called you a mother fucker?
8    A. The name of the officer?
9    Q. Yes, yes.
10    A. I don't remember.
11    Q. Okay. Was he chasing you? Was he following
12 you in the first police car or in the second police
13 car?
14    A. In the second car.
15    Q. Okay. So where were their vehicles parked
16 then?
17    A. On the road, on Jesus T. Avila.
18    Q. And then you said that Jacob drove your car out
19 of the driveway; is that correct?
20    A. Yes.
21    Q. And are you sure that was Jacob Borjas who did
22 that?
23    A. I think so.
24    Q. Had you ever seen Jacob Borjas before?
25    A. Yes.

## Page

1    Q. From where?
2    A. I saw him in a shop, Marroquin shop, yes.
3    Q. And when did you see him at Marroquin's shop
4 prior to this incident?
5    A. About two months or one month. I don't
6 remember the time.
7    Q. Okay. Can you describe Jacob Borjas to us,
8 please?
9    A. Yes. He is kind of a chubby man, dark skin.
10 He does not wear any glasses, only.
11    Q. Is he short or tall?
12    A. Tall.
13    Q. Do you know who the other officer who followe
14 you that evening was?
15    A. The other one was shorter than he was. He had
16 glasses on. He was wearing glasses, yes. He was
17 dark-skinned, also.
18    Q. Was it dark that evening?
19    A. Yes.
20    Q. Okay. Now, was there a light in your driveway,
21 or how were you able to see these people?
22    A. I have an automatic light on my driveway.
23    Q. When is that light triggered?
24    A. As you turn into the driveway.
25    Q. Okay. So was it -- so you don't know the name

Case 1:99-cv-00195   Document 28   Filed in TXSD on 11/07/2000   Page 19 of 29

Page 21

1 of the officer who got you out of your car, correct?
2 A. No.
3 Q. Okay, had you ever seen him before?
4 A. No.
5 Q. Okay. When you were at Marroquin's shop and
6 you said you saw Jacob Borjas, you said that was
7 approximately two months earlier?
8 A. More or less.
9 Q. Okay. How did you know that was Jacob Borjas
10 at that time? Did he identify himself?
11 A. No.
12 Q. Did anybody refer to him as Jacob Borjas?
13 A. Marroquin, Marroquin, I told him.
14 Q. Okay. What do you mean you told him?
15 A. I told him or talked to him, what he had said
16 that day.
17 Q. Okay. When did you talk to Marroquin?
18 A. When I talked to him? I talk to him every day.
19 Q. Well, why do you talk to him every day?
20 A. Because he is a very good friend of mine. He
21 works, and he does work or jobs for me.
22 Q. Your affidavit on page 2 and 3 states that you
23 overheard Jacob Borjas tell ex-mayor Marroquin that he
24 loved it when people avoided his stops.
25 A. Yes.

Page 22

1 Q. Did that happen before or after this incident
2 when you were followed and arrested?
3 A. It was before, before.
4 Q. Okay. And how do you know that was Jacob
5 Borjas there, the person who made the statement that he
6 loved it when people avoided his stops and that he
7 loved to chase people or do pursuits? How do you know
8 that was Jacob Borjas that day?
9 A. Well, that day, I did not know it was him. I
10 found out after the incident.
11 Q. Okay. So it could be that Jacob -- was that
12 the only time you had seen Jacob Borjas? And I mean by
13 this at Marroquin's shop.
14 A. Yes.
15 Q. That was the only time?
16 A. Yes.
17 Q. The other time was when you were followed and
18 arrested, correct?
19 A. Yes.
20 Q. Okay, now, when you were there at the Marroquin
21 shop, did he have his uniform on?
22 A. Yes, he was in his police car.
23 Q. Okay. And did he have a name tag on?
24 A. Yes, but that day, I did not notice it.
25 Q. Okay, so you did not notice what his name was,

Page 2

1 correct, when you were at Marroquin's shop?
2 A. Yes.
3 Q. Now, did anybody refer to him as Jacob, or did
4 anybody call him Borjas during the time you were wi.
5 -- at the ex-mayor's shop?
6 A. No.
7 Q. Okay. So it could have been that some other
8 police officer other than Borjas could have made that
9 statement to the mayor, correct?
10 MR. QUINTANA: Objection; argumentative.
11 A. Yes.
12 Q. And on the day that you were pulled over and
13 subsequently arrested, were you able to read the name
14 tag on the police officer that evening?
15 A. No.
16 Q. Okay. Did anybody refer to that police
17 officer -- did anybody call him Jacob or Jacob Borjas
18 that evening?
19 A. No.
20 Q. So it could be also that you really don't know
21 what Jacob Borjas looks like, correct?
22 MR. QUINTANA: Objection; argumentative.
23 A. Yes.
24 Q. And that also means that you really don't know
25 whether Jacob Borjas was present on the day you wer.

Page 2

1 pulled over and arrested, correct?
2 MR. QUINTANA: Objection; argumentative.
3 A. Yes.
4 Q. So you really don't know whether Jacob Borjas
5 made a statement saying, "I love it when people avoid
6 stops," and that he loves it when -- to chase people or
7 do pursuits. That could have been somebody else who
8 said that, right?
9 A. Yes.
10 Q. Now, why is it that you come up with Jacob
11 Borjas's name as the person who was there at the shop
12 and who also followed you and arrested you? Why is his
13 name involved in this if you're not really sure what he
14 even looks like?
15 A. Okay, Marroquin was -- because I conversed with
16 him and I told him what had happened to me, and I
17 showed him my ticket, because he gave me a ticket. And
18 the ticket, he gave it to me because of P.I.
19 Q. P.I., which means public intoxication?
20 A. And that day, I did not drink anything. I
21 never drink when I am working. And I told Marroquin.
22 I conversed with him about this, and he was the one
23 that told me -- he was the same person that had been
24 conversing with him that day.
25 Q. Okay, and the ticket that you got was for

Case 1:99-cv-00195   Document 28   Filed in TXSD on 11/07/2000   Page 20 of 29

**Page 25**

1   public intoxication, correct?

2   A. Yes.

3   Q. Okay, and based on this ticket, Marroquin told

4   you that it was Borjas that was the one who was there

5   at his shop several months earlier; is that correct?

6   A. Yes.

7   Q. Could it have been that you and Borjas were

8   there at the shop on several other instances, but you

9   just didn't know it was Borjas?

10   A. Only that time I saw him.

11   Q. Okay. But you're just saying this based on

12   what Marroquin told you, correct?

13   A. Yes.

14   Q. But you do not have any firsthand knowledge

15   that you were ever present with Borjas at Marroquin's

16   shop, correct?

17   A. Yes.

18   Q. So all you're relying on is Marroquin's

19   statement to say, "Yeah, that was the same guy here.

20   That was Borjas, the same guy who was here at one point

21   with you"?

22   A. Yes.

23        MR. RUIZ: Okay. I'm going to

24   introduce -- I'm going to mark this as Exhibit No. 2,

25   please.

**Page 26**

1        (Garza Exhibit No. 2 was marked)

2   Q. Mr. Robles, have you seen this ticket before?

3   A. Yes. This is it, the one of that day.

4   Q. Okay, and is that your signature at the bottom?

5   A. Yes.

6   Q. Okay, and do you remember signing that?

7   A. Yes.

8   Q. Okay. Now, if you look at the ticket, the

9   ticket states that it occurred on August 10th of 1997.

10   Okay, your testimony says it happened on or about March

11   of 1998.

12   A. Because I was not sure.

13   Q. Okay. So this incident that you're testifying

14   about in your affidavit really occurred on August 10th

15   of 1997, correct?

16   A. Yes.

17   Q. Okay. Now, it states here -- can you please

18   give me the name -- it states here that -- there's a

19   section towards the bottom of the affidavit. What

20   other name do you see there on the ticket that you

21   received?

22   A. Manuel Morales.

23   Q. Okay, and do you know who Manuel Morales is?

24   A. I don't know him.

25   Q. Okay. Now, it says -- this ticket says that --

**Page 27**

1   even though you don't know him, he was the one --

2   was the officer that is charging you for public

3   intoxication; would that be correct?

4   A. Yes.

5   Q. Okay. So do you see anywhere on this ticket

6   where Jacob Borjas's name is written?

7   A. No, but it could have been the other officer.

8   Q. Okay, so there's another officer you're saying,

9   then?

10   A. Yes, there was two officers.

11   Q. Okay. And would you agree with me that one of

12   the officers was Manuel Morales, based on this ticket?

13   A. Yes.

14   Q. Okay. Now, this ticket also lists the

15   charge -- it confirms the charge that you stated --

16   that it was public intoxication why they were arresting

17   you, correct?

18   A. Yes.

19   Q. Now, Mr. Garza, I also have -- when you were --

20   you said you were taken back -- that your truck was

21   pulled out of your driveway, correct?

22   A. Yes.

23   Q. Okay. Now, you're not really sure whether that

24   was Jacob Borjas who did that, right?

25   A. The one that did this was the one on the second

**Page 28**

1   car, yes.

2   Q. Okay. So are you telling me Manuel Morales was

3   the officer in the first car?

4   A. Yes, uh-huh.

5   Q. Okay. But you don't know who the second

6   officer was from the second car, correct?

7   A. I do not know his name, but I know how he looks

8   or his physical appearance is.

9   Q. So you're not sure whether that's Jacob Borjas

10   or not?

11   A. No.

12   Q. Now, where were you -- were you handcuffed?

13   A. Yes.

14   Q. Where did they handcuff you?

15   A. Out on the road, outside.

16   Q. When they handcuffed you, what did they do

17   next?

18   A. They put me into the police car, and they moved

19   my car backwards.

20   Q. Okay. Now, they took your car -- did they

21   first -- how did they get the keys for the car?

22   A. He asked me for them before he handcuffed me.

23   Q. And you gave them to him, correct?

24   A. Yes, because I thought that he was going to

25   take it somewhere.

## Page 29

1 Q. Okay. Were you then immediately handcuffed?
2 A. Yes.
3 Q. Okay. And what did they do after that?
4 A. They took me to Santa Rosa -- no, to La Feria.
5 Q. Okay, now, they put you inside the car,
6 correct?
7 A. Yes.
8 Q. Which car? Was it Manuel Morales's first unit
9 that was following you or the second one?
10 A. In the first car.
11 Q. Okay. Now, so was there anybody -- did the
12 officer get inside his car once you were arrested and
13 placed in the back seat?
14 A. Yes.
15 Q. Okay. And then you're telling us -- you're
16 telling the jury that the other police officer went
17 with the keys and pulled your truck -- your car out of
18 the driveway, correct?
19 A. Yes.
20 Q. Okay. Now, when they pulled the car out of the
21 driveway, where did they take the car?
22 A. My car?
23 Q. Yes, your car.
24 A. They left it there, outside, right on the
25 grass.

## Page 30

1 Q. Okay. Does your house have a sidewalk?
2 A. Yes.
3 Q. Okay. So was it parked in front of your -- did
4 it block your driveway where they parked your car?
5 A. Yes.
6 Q. Were the other -- was your wife's mini van able
7 to get out of your driveway?
8 A. No.
9 Q. Okay. What happened after the other police
10 officer parked the car, your car, in front of your
11 driveway?
12 A. Both of them left to take me to La Feria.
13 Q. They took you in two cars or in one car?
14 A. One car.
15 Q. Okay. So the police officer that moved the
16 truck got inside the same car with you and Manuel
17 Morales?
18 A. Yes.
19 Q. Okay. And the other car was left there, parked
20 in front of your house; is that correct?
21 A. Yes.
22 Q. Okay. And how long did it take between the
23 time you were arrested and placed in the back seat of
24 the car and the time that the second police officer got
25 inside the car to go to La Feria?

## Page 31

1 A. 10 minutes.
2 Q. Okay, did you see any other police units or
3 police cars stop at that time?
4 A. No.
5 Q. Okay. How about a sheriff's officer?
6 A. No.
7 Q. Okay. And you were then taken to La Feria
8 jail, correct?
9 A. Yes.
10 Q. Okay, you state that, according to your
11 affidavit, that both officers had drawn their guns on
12 you.
13 A. Yes.
14 Q. Okay. And that one of the officers grabbed you
15 by the hair.
16 A. Yes.
17 Q. Were you inside your car when he pulled you by
18 the hair?
19 A. Yes, with the door open.
20 Q. Okay. Do you know why he pulled your hair?
21 A. He got mad because I did not stop outside of
22 the street. He got mad because I stopped inside, into
23 the driveway.
24 Q. Did he tell you this?
25 A. Yes.

## Page 32

1 Q. Okay. So let's go back to the time when you
2 were getting on Jesus T. Avila Street, okay? I want to
3 explore that again. Okay, when you saw the -- you said
4 that you saw the police lights turned on behind you,
5 correct?
6 MR. QUINTANA: Objection; asked and
7 answered.
8 A. Yes.
9 Q. How far were you from your house?
10 MR. QUINTANA: Objection; asked and
11 answered.
12 MR. RUIZ: I'm going to object to that
13 objection because I have not asked him this question
14 before.
15 A. About 10 steps on the second house.
16 Q. Okay, so you were in front of the second house?
17 A. Yes.
18 Q. Okay. Why didn't you stop when you first saw
19 the lights, then?
20 A. Because what I thought it was better to do was
21 to get into the driveway and then get down and talk to
22 them.
23 Q. How close is the second house from your house?
24 A. 10 steps.
25 Q. Are they right next to each other?

Case 1:99-cv-00195   Document 28   Filed in TXSD on 11/07/2000   Page 22 of 29

## Page 33

1   A. Yes.

2   Q. Is there a fence between the two houses?

3   A. Yes.

4   Q. And you share the same border, I guess?

5   A. Yes.

6   Q. Okay. Did they tell you why it was that they

7 turned the lights on?

8   A. I asked them, yes.

9   Q. Okay. Now, you said that your door was open

10 and they pulled you by the hair and they put a gun to

11 your head. Who put a gun to your head?

12   A. The second car.

13   Q. Okay. Did you fight with them during that

14 time?

15   A. No.

16   Q. Did you use any bad words or call them

17 derogatory -- did you make any derogatory remarks to

18 the police officers?

19   A. No.

20   Q. Had you ever been pulled over before?

21   A. Stopped, yes.

22   Q. Okay. How many times?

23   A. Many, many.

24   Q. Many? Is it five times or 10 times? Can you

25 approximate how many times you have been pulled over

## Page 34

1 before?

2   A. Five or six times.

3   Q. And what were the reasons they pulled you over

4 for?

5   A. With problems or defects in my car.

6   Q. Okay. Did your car have any defects on that

7 day?

8   A. That day, no.

9   Q. When you were pulled over those other six

10 times, did you pull over immediately once you saw the

11 lights on the car?

12   A. Sometimes, and sometimes I had to wait to where

13 there was space where I could park.

14   Q. Okay. Tell me about why they put you on the

15 ground. Who put you on the ground? Was it both of

16 them or just one?

17   A. Both of them.

18   Q. Okay. What did they do to put you on the

19 ground?

20   A. They pushed me to the bottom.

21   Q. Okay. Did they arrest you while you were on

22 the ground?

23   A. They did not handcuff me on the grass. They

24 handcuffed me outside.

25   Q. Okay. So they put you on -- when they put you

## Page 3

1 on the ground, they put you on the ground -- you mean

2 on the grass, correct?

3   A. Yes.

4   Q. Did they tell you why they were putting you on

5 the ground?

6   A. To handcuff me.

7   Q. But you said that they didn't handcuff you at

8 that time, correct?

9   A. No. I heard one officer say, "Let's get him

10 outside so we can handcuff him," but I don't know who

11 said that.

12   Q. Now, were you taller than the officers,

13 Mr. Garza?

14   A. No. I was the same.

15   Q. Okay. And what is your height, Mr. Garza?

16   A. 5'11".

17   Q. Okay. Is that -- is that what your driver's

18 license reads?

19   A. Yes.

20   Q. Okay. So you said that you kept asking why you

21 were being arrested, and you said Officer Borjas kept

22 telling you to shut up; is that correct?

23   A. The second officer was the one that was telling

24 me to shut up.

25   Q. And that's the second officer, which you really

## Page 3

1 don't know who that is, right?

2   A. Yes.

3   Q. So this affidavit testimony that you have that

4 states, "Officer Borjas kept telling me to shut up," is

5 incorrect, right?

6   A. Now, yes, now that I see the name here.

7   Q. So your references to Jacob Borjas on this

8 entire affidavit are incorrect, right?

9   A. Yes.

10   Q. Okay. Your affidavit states that they took you

11 to the street and they threw you again to the ground,

12 okay? How long did it take between the time you wei

13 put to the ground -- you were taken to the ground on

14 the grass until the time you were taken to the ground

15 on the street?

16   A. Two minutes, three minutes.

17   Q. Were your eyes red, Mr. Garza, that evening?

18   A. Yes.

19   Q. You said that you don't drink when you play; is

20 that correct?

21   A. No, they will not let us drink.

22   Q. Who is "they"?

23   A. We have a representative by the name of Ignacio

24 Aguirre.

25   Q. And who is he?

Case 1:99-cv-00195  Document 28  Filed in TXSD on 11/07/2000  Page 23 of 29

**Page 37**

1  A. He is the one that represents the group.
2  Q. Okay. Have you ever smoked marijuana before?
3  A. Never.
4  Q. You said here that the other officers were
5  holding your hands behind your back when you felt a hit
6  to the back of your head. What other officers were
7  there other than Morales and the one that you don't
8  know who the second officer is?
9  A. It was Morales on the second car. With
10  Morales, there was another officer. There were three
11  officers.
12  Q. Oh, there were three officers?
13  A. Yes.
14  Q. Okay. And do you know who the third -- and the
15  other officer rode with Morales; is that correct?
16  A. Yes.
17  Q. Okay. And do you know what his name is?
18  A. No.
19  Q. It says that you felt -- you were kicked in the
20  back of your head; is that correct?
21  A. Yes. I felt -- well, I felt that somebody hit
22  me on the head with a club.
23  Q. And were you facing the ground at that time?
24  A. Yes.
25  Q. Okay. And you state here that it was Borjas

**Page 38**

1  who had his knee on the back of your -- and that the
2  hit came from Officer Borjas. Are you sure about that?
3  A. Yes, because Morales, Morales, I was looking at
4  him.
5  Q. But are you sure you were hit by Jacob Borjas?
6  A. Yes, because he was the one that was behind me.
7  Q. I thought you said earlier that you really
8  don't know what Jacob Borjas looks like.
9  A. Well, no, no, no, I do not know how he is.
10  Q. So you're not really sure it was Borjas who hit
11  you, correct?
12  A. Yes.
13  Q. So this statement right here is also wrong,
14  right, with respect to Borjas hitting you on the back
15  of your head?
16  A. Yes.
17  Q. And you're also not sure that it was Borjas who
18  got in your car and put it on the street, correct?
19  A. Yes.
20  Q. It says that you -- you had previously told us
21  you had gone to the La Feria Police Department. Were
22  you booked there?
23  A. Yes, uh-huh.
24  Q. And how many officers showed up at that time?
25  A. Two.

**Page 39**

1  Q. Okay. Was one of them Manuel Morales?
2  A. Yes.
3  MR. RUIZ: I'm going to mark this as
4  Exhibit No. 3.
5  Q. If you could take a look at this, Mr. Garza.
6  This is the booking card that they used at the La Feria
7  Police Department that evening.
8  A. Uh-huh.
9  Q. Do you recall putting your fingerprints on this
10  booking card?
11  A. Yes, I believe so.
12  Q. Okay. What names do you see on this booking
13  card besides yours?
14  A. Here, Manuel Morales.
15  Q. Do you see any other names?
16  A. Here is Vasquez.
17  Q. Okay. Is this your correct social security
18  number, Mr. Garza, 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?
19  A. Yes.
20  Q. And is the offense that they are charging for,
21  based on this booking card, public intoxication?
22  A. Yes.
23  Q. When you were booked, you were really booked by
24  Officer Vasquez and -- by Officer Vasquez that evening,
25  correct?

**Page 40**

1  A. Yes.
2  Q. Okay. Now, how long were you there at the
3  La Feria jail?
4  A. More or less about 6:00 in the morning.
5  Q. Could it be that you were -- did you call your
6  wife that day?
7  A. When I was released, yes.
8  Q. Did she go pick you up?
9  A. Yes.
10  Q. Okay. Now, after being charged with public
11  intoxication, did you ever -- while you were being
12  charged with public intoxication, you said you spoke
13  one of the police officers who you thought was Jacob
14  Borjas and they told you that they have a right to stop
15  you whenever they want; is that correct?
16  A. They said that at that time, yes -- or at that
17  hour.
18  THE INTERPRETER: Excuse me.
19  Q. Okay. Did they say why they didn't take you to
20  Brownsville?
21  A. They told me that they were going to give me a
22  break.
23  Q. Did they give you a Breathalyzer test, sir?
24  A. No.
25  Q. Did you ask for one?

Case 1:99-cv-00195   Document 28   Filed in TXSD on 11/07/2000   Page 24 of 29

## Page 41

1    A. I told the officer to give me a physical. He
2    told me that he did not need to make one because the
3    way he could see me, he could see that I was very
4    drunk.
5    Q. Okay, so what do you mean by "a physical"?
6    A. So that he could give me the machine where I
7    could blow into it.
8    Q. Had you been given that test before?
9    A. Prior to that, yes.
10    Q. And where was that?
11    A. In Mercedes.
12    Q. Okay. So your previous testimony that you were
13    only pulled over for having automobile inspection
14    problems is not true, right?
15    MR. QUINTANA: Objection; mischaracterizes
16    the evidence -- the previous testimony.
17    A. That one where I tell you that they checked me,
18    that was through the DPS.
19    Q. Okay, so you have been -- so the DPS -- how
20    many times has the DPS pulled you over?
21    A. DPS, two times.
22    Q. Okay. And where did -- one time was in
23    Mercedes; is that correct?
24    A. Yes.
25    Q. And another time was where?

## Page 42

1    A. In Brownsville.
2    Q. Okay. And why did they pull you over?
3    A. In Brownsville?
4    Q. And in Mercedes, both places.
5    A. In Mercedes, the officer said that the license
6    plate did not have a light, but I did have a light on
7    my license plate, but he had not seen it.
8    Q. But he went ahead and gave you a Breathalyzer
9    test?
10    A. Yes -- no, to blow into it. No, it was with
11    the pen.
12    Q. Okay, so they did the -- you followed the pen
13    when you were stopped in Mercedes or in Brownsville?
14    A. In Mercedes.
15    Q. And that must have been on a suspicion that you
16    had been under the influence of alcohol; would that be
17    correct?
18    MR. QUINTANA: Objection; calls for
19    speculation.
20    A. Yes, because I told him that I was coming from
21    a dance.
22    Q. Had you been drinking that night?
23    A. No, no, I was working.
24    Q. Okay. So in Mercedes, when the DPS pulled you
25    over, what happened after he gave you the test?

## Page 43

1    A. Everything came out fine.
2    Q. Did he give you -- did he issue you a ticket?
3    A. No.
4    Q. Okay. How about in Brownsville? Were you
5    issued a ticket in Brownsville?
6    A. No, no.
7    Q. Why did they pull you over in Brownsville?
8    MR. QUINTANA: Asked and answered.
9    A. In Brownsville, it was not in my car. It was
10    on the company's truck or bus.
11    Q. Okay, the company bus, and you mean Cano
12    Produce or the group's bus? What do you mean?
13    A. It was the truck from Cano Produce.
14    Q. Okay. So were you working during that time?
15    A. Yes.
16    Q. Okay. And did he give you a Breathalyzer test
17    or the pen test at that time?
18    A. No, neither one.
19    Q. Okay. Did you ever file a complaint against
20    any of the three officers who followed you and arreste
21    you on August 10th, 1997?
22    A. No.
23    Q. And why not?
24    A. Well, I did not have any witnesses of anything.
25    Nobody was going to believe me on anything.

## Page 44

1    Q. Okay. You said a friend told you you should.
2    Who is the friend that told you you should file a
3    complaint?
4    A. Rogelio Perez.
5    Q. Do you know a lady by the name of Benita Ruiz?
6    A. Well, no.
7    Q. Okay. Do you know -- did you know a gentleman
8    by the name of Jose Cuellar?
9    A. No.
10    Q. Do you know any of the Olivarez family member
11    who live in Santa Rosa?
12    A. No.
13    Q. Did you ever make a report with the sheriff or
14    with the County about the behavior of the police
15    officers that evening?
16    A. No.
17    Q. Did you ever make a complaint with the city
18    hall or with the city commission?
19    A. No.
20    Q. You had stated earlier that you had not been
21    drinking, correct?
22    MR. QUINTANA: Objection; asked and
23    answered.
24    A. Yes.
25    Q. Did you go to court as a result of the ticket

Page 45

1 for public intoxication issued to you that day?
2  A. I went to pay the ticket.
3  Q. Okay. But did you go to court?
4  A. No.
5  Q. Okay. Now, isn't it true that you pled guilty
6 in open court for public intoxication, Mr. Garza?
7  A. Yes, because I had nothing else to do.
8    MR. RUIZ: Okay. Now, I'm going to mark
9 this as Exhibit No. 4.
10   (Garza Exhibit No. 4 was marked)
11  Q. Have you ever seen this document before,
12 Mr. Garza?
13  A. No.
14  Q. But you did go to court, correct?
15  A. In Santa Rosa, yes.
16  Q. Okay. And the judgment by the municipal court
17 judge states that you, as you had stated earlier,
18 stated you were guilty of the charge of public
19 intoxication, correct?
20  A. Yes.
21  Q. Okay. Now, you said you also paid a fine. For
22 how much was the fine?
23  A. $100.
24  Q. Okay. Do you see where that is reflected in
25 this municipal court docket?

Page 46

1  A. No.
2  Q. Okay. How about if you look towards the
3 bottom, down there?
4  A. Oh, yes, it's here.
5    MR. RUIZ: Okay. Okay, I'll pass -- wait.
6 Before I pass the witness --
7  Q. Have you had any other run-ins with the Santa
8 Rosa police since the August '97 incident?
9  A. No.
10  Q. Do you have any ill feelings towards the Santa
11 Rosa police officers or police department?
12  A. No.
13    MR. RUIZ: Okay. I'll pass the witness.
14   (Brief recess)
15    EXAMINATION
16 BY MR. QUINTANA:
17  Q. Mr. Garza, my name is Carlos Quintana, and I
18 represent the Cuellar family.
19  A. Yes.
20  Q. Mr. Garza, have you ever been treated like you
21 were treated by these officers before?
22  A. No.
23  Q. Any police officer?
24  A. No.
25  Q. Now, you travel a great deal, don't you?

Page 47

1  A. Yes.
2  Q. And you go to several cities?
3  A. Yes, and states.
4  Q. Several states, right?
5  A. Yes.
6  Q. And for how long have you been doing this?
7  A. Since I was 10 years old.
8  Q. Okay, and you have never been stopped and
9 treated like you were treated on that night of August
10 10th of 1997?
11  A. Never. I had never been treated like that.
12  Q. Now, did you ever give any reason for these
13 police officers to stop you?
14  A. To them, I did not give any reason.
15  Q. All right, were you driving erratic?
16  A. No.
17  Q. Were you speeding?
18  A. No.
19  Q. Were you weaving?
20  A. No, no.
21  Q. Were you fully aware of what you were doing?
22  A. Yes.
23  Q. So it's your testimony that you did not give
24 any reason whatsoever for these police officers to stop
25 you that night?

Page 48

1  A. Yes, I did not give any reason.
2  Q. Okay. And prior to your pulling into your
3 driveway, you were not in violation of any laws that
4 you know of?
5  A. No.
6  Q. All right. When the officers approached you,
7 did they identify themselves by name?
8  A. No.
9  Q. Did they say to you, "The reason why we stopped
10 you is this"?
11  A. Yes.
12  Q. What did they tell you?
13  A. That it was 3:00 in the morning and they could
14 stop whoever they wanted to at that hour.
15  Q. Okay. Did they say that to you immediately
16 after they stopped you or afterwards?
17  A. Afterwards.
18  Q. Were the officers courteous to you?
19  A. No.
20  Q. Did they approach your window or your door and
21 say, "Can I see your driver's license"?
22  A. No.
23  Q. Before you got out of the car, did they say
24 anything else to you?
25  A. Before, no.

Page 49

1    Q. All right. They did not say, "My name is
2    Officer Morales"? Did anybody say, "My name is Officer
3    Morales. I'm stopping you for this reason" as soon as
4    they stopped you?
5    A. Well, no.
6    Q. Did the other Vasquez officer, did he say, "My
7    name is Officer Vasquez," before they pulled you out of
8    the car?
9    A. No, he did not present himself.
10   Q. All right. So did -- the first thing you know
11   is that you see officers with their guns pointing
12   towards you?
13   A. Yes.
14   Q. Did you get scared?
15   A. Yes, that's what I saw.
16   Q. Did you get scared?
17   A. A lot.
18   Q. Now, in light of the fact that you saw the guns
19   pointing at you, did you put any resistance?
20   A. No.
21   Q. Were you yelling or being combative?
22   A. No.
23   Q. Did they say, "Put your hands up in the air"?
24   A. No.
25   Q. Okay. So one of the officers was pointing a

Page 50

1    gun at you, and the other one grabbed you by the hair
2    and pulled you out. Is that what you're saying?
3    A. Yes.
4    Q. Did he give you any warning that he was going
5    to pull you by the hair?
6    A. No.
7    Q. Did he say, "Would you please step out of the
8    car"?
9    A. No, they did not tell me anything.
10   Q. What he did is he grabbed you by the hair and
11   pulled you out; is that right?
12   A. Yes.
13   Q. Okay. No words were spoken before?
14   A. No.
15   Q. Okay. When he pulled you by the hair, did you
16   hit the ground?
17   A. Yes.
18   Q. Did you hit hard?
19   A. Yes, hard.
20   Q. Now, as a result of the injuries that you
21   sustained that night, were any pictures taken by
22   anybody?
23   A. No.
24   Q. Did you have to receive any medical treatment?
25   A. Yes.

Page 5

1    Q. How is that?
2    A. Okay, I had a lot of pain.
3    Q. Where?
4    A. Right here, in this part right here.
5    Q. And what did you do about that pain?
6    A. I was going for a week to therapy.
7    Q. What therapy is that, sir?
8    A. Just a second. This one right here.
9    Q. Valley Family -- Family Health Clinic?
10   A. Uh-huh. I'm still going right now because I
11   had an accident.
12   Q. Okay. And what was the name of the doctor who
13   was seeing you there?
14   A. It's a young girl by the name of Rosie.
15   Q. And who was giving you the therapy, Rosie?
16   A. Yes.
17   Q. Okay, when did you have your accident? Is that
18   a car accident that you're talking about?
19   A. It was on the truck, the company truck.
20   Q. Okay. When did you have that?
21   A. A month ago.
22   Q. Okay. And because of that, you had these
23   appointments or had this appointment on July 31st of
24   2000?
25   A. Yes.

Page 5

1    Q. Okay. But that is the same clinic that you
2    went to to get treatment because of the injuries that
3    these officers caused you; is that right?
4    A. Yes.
5    Q. And you said that you went for about seven
6    days?
7    A. Seven days.
8    Q. All right. Now, can you tell me why is it that
9    you were not charged with driving while intoxicated?
10   A. Why they didn't make --
11   Q. Right.
12   A. No.
13   Q. Well, you were driving a vehicle, right?
14   A. Yes.
15   Q. And they claimed -- the officers claimed that
16   you were very drunk, right?
17   A. Yes.
18   Q. Well, then, but they didn't charge you with
19   DWI, right?
20   A. No.
21   Q. They came up with this public intoxication
22   charge, right?
23   A. Yes.
24   Q. And is it your impression that they charged you
25   with public intoxication to justify what they did to

## Page 53

1 you?
2       MR. RUIZ: Objection; speculation.
3       A. Yes.
4       Q. All right. Now, you said earlier that you did
5 not want to fight the ticket because you did not have
6 any witnesses, correct?
7       A. Yes.
8       Q. Now, if you had witnesses, then you would have
9 fought the ticket?
10       A. Yes.
11       Q. Okay. Now, when you talked to Mr. Marroquin,
12 did you explain to him the details of what occurred to
13 you?
14       A. Yes.
15       Q. And what was his response?
16       A. He told me to look for an attorney.
17       Q. Did he suggest the names of any lawyers to you?
18       A. No.
19       Q. Okay. Now, what type of relationship did you
20 have with Mr. Marroquin back in 1997?
21       A. Very good friends.
22       Q. Okay, what are the kinds of things that you
23 were doing together?
24       A. He is a welder. He welds. He does jobs for
25 me, welding some type of materials or rods or odd

## Page 54

1 things.
2       MR. RUIZ: "Iron work."
3       A. Iron work.
4       THE INTERPRETER: Thank you.
5       Q. Would you eat together?
6       A. No, no.
7       Q. Okay. So the relationship that you had with
8 him was confined to shop kinds of things?
9       A. Yes.
10       Q. Nothing outside of that?
11       A. No, nothing like that.
12       Q. All right. And what was his reaction,
13 Marroquin's reaction, when you were telling him about
14 the excessive force that the officers used against you?
15       MR. RUIZ: Objection. That's hearsay.
16       A. He could not believe it. He was in awe.
17       Q. Okay. And did he suggest that you go and file
18 a report with the police department or the city?
19       A. Yes, he told me.
20       MR. RUIZ: Let me object to that.
21 Hearsay.
22       MR. QUINTANA: Are you making substantive
23 objections? I'm just saying, I thought we were taking
24 this by the rules. Anyway --
25       Q. So what is it that Mr. Marroquin told you with

## Page 5

1 respect to the guns being pointed at your head?
2       A. Marroquin told me that, when you resist the
3 arrest, they can do that.
4       Q. Okay. Did you resist arrest?
5       A. No.
6       Q. Okay. Now, did you attempt to talk to anybody
7 with the police department, the chief of police, about
8 this incident?
9       A. No.
10       Q. Okay. Now, this incident that happened to you
11 with the use of excessive force against you by these
12 police officers that occurred on August 10th of 1997
13 did occur, right?
14       MR. RUIZ: I'm going to object to that as
15 speculation or mischaracterizing the testimony of the
16 witness.
17       Q. Okay, what you have described in your
18 Deposition Exhibit 1 did occur, correct?
19       A. Yes, it did happen. It did happen.
20       Q. Regardless of what the name of the officers
21 are?
22       A. Yes.
23       Q. The fact of the matter remains is that the
24 facts contained with respect to the incident that
25 happened to you did occur?

## Page 5

1       A. Yes, it did happen.
2       MR. QUINTANA: Okay, pass the witness.
3       EXAMINATION
4 BY MR. RUIZ:
5       Q. Just some follow-up questions, Mr. Garza. Do
6 you have any police training?
7       A. No.
8       Q. Or have you ever taken any courses on police
9 stops or --
10       A. No.
11       Q. Okay. So you said that, even though you don't
12 think there was a reason for them pulling you over, it
13 may have been that they pulled you over because you
14 didn't stop immediately when they turned on their
15 lights, correct?
16       MR. QUINTANA: Calls for speculation.
17       A. Probably, yes.
18       Q. Now, that day, did you work earlier in the day,
19 Mr. Garza?
20       A. Yes, I start work at 4:00 in the morning.
21       Q. Okay. And with Cano Produce?
22       A. Yes.
23       Q. And you were stopped at approximately -- you
24 were stopped at around 3:00 in the morning; is that
25 correct?

Page 57

1    A. Yes.
2    Q. But this happened on a Saturday, correct?
3    A. Saturday.
4    Q. And I guess it was the early morning hours of
5    Sunday?
6    A. Yes.
7    Q. And on the Saturday, you worked at 4:00 in the
8    morning?
9    A. Yes.
10   Q. So what time did you get out of work that day?
11   A. At 1:00.
12   Q. Okay. And what did you do after 1:00 that day?
13   A. I went with my wife to bring some groceries.
14   Q. And how long did that take?
15   A. Until 4:00 in the afternoon.
16   Q. And then what did you do?
17   A. We went to leave the equipment at the dance
18   hall, to the Flamingo.
19   Q. And how long did that take?
20   A. Until 8:00.
21   Q. Okay. And then what did you do after 8:00?
22   A. We were playing.
23   Q. Okay. And then what time did you get done
24   playing?
25   A. At 2:00 in the morning.

Page 58

1    Q. Okay. And then what did you do after 2:00 in
2    the morning?
3    A. I went to my house.
4    Q. Okay, but did you have to pick up your
5    equipment?
6    A. Only my drum set.
7    Q. Okay. And you said you were done at 2:00 in
8    the morning and that it's a 20-minute drive to Santa
9    Rosa from the Flamingo. What happened in between,
10   let's say, 2:30 to 3:00 in the morning?
11   A. I picked up my drum set.
12   Q. So you had been basically working all day?
13   A. Yes.
14        MR. QUINTANA: I'm going to object to
15   those questions. They are outside my
16   cross-examination.
17   Q. Okay, you can go ahead and answer.
18   A. Yes.
19   Q. Would it be fair to say that you were tired?
20        MR. QUINTANA: Object to that question.
21   It's outside the scope of examination.
22   A. Yes.
23   Q. Could it be also that you were sleepy?
24        MR. QUINTANA: Objection to that question
25   as being outside the scope of examination.

Page 59

1    A. A lot.
2    Q. Were you maybe falling asleep while you were
3    driving?
4        MR. QUINTANA: Objection to that question.
5    It's outside the scope of examination.
6    A. No.
7    Q. Now, you said that you received medical
8    treatment for approximately seven days?
9    A. Yes.
10   Q. Okay, what was the name of that place where
11   you --
12        MR. RUIZ: If he could show us the card
13   again. I didn't get it.
14   Q. Okay, it's the Valley Family Health Clinic.
15   A. Uh-huh.
16   Q. In Weslaco. And was that the first time you
17   had been there?
18   A. Yes.
19   Q. Okay. You said Marroquin and yourself are very
20   good friends. Does he know your name?
21   A. No.
22   Q. So does he call you by Eliseo?
23   A. Garza only.
24   Q. He just calls you Garza?
25   A. Yes.

Page 60

1    Q. Okay. How many times have you done work with
2    him -- have you taken work to him?
3    A. Many times.
4    Q. Okay. Now, this affidavit that you have, this
5    testimony, who helped you prepare this?
6        MR. QUINTANA: Objection. I'm going to
7    object to the question. It's outside the scope of
8    examination.
9    Q. You can answer.
10   A. I don't remember.
11   Q. Did you type this out, then?
12        MR. QUINTANA: Object to that question.
13   It's outside the scope of examination.
14   A. Yes.
15   Q. You wrote all of this, these three pages?
16        MR. QUINTANA: I object to that question
17   as outside the scope of examination.
18   A. Yes.
19   Q. Isn't it true that somebody took this piece of
20   paper to your -- to you?
21        MR. QUINTANA: Object to that question as
22   outside the scope of examination.
23   A. Yes.
24   Q. And did you have someone read it for you and
25   translate it to you in Spanish?

## Page 61

```
1        MR. QUINTANA: Object to that question as
2  outside the scope of examination.
3     A. Yes.
4     Q. And did they tell you just to sign your name
5  here?
6        MR. QUINTANA: Object to that question as
7  outside the scope of examination.
8     A. Yes.
9     Q. Did you read every -- did they translate every
10 word of this document?
11       MR. QUINTANA: Object to that question as
12 outside the scope of my examination.
13    A. Yes.
14    Q. Okay. And who was the person -- well, describe
15 the person who took this document to you.
16       MR. QUINTANA: Object to that question as
17 outside the scope of my examination.
18    A. I don't remember who it was.
19       MR. RUIZ: Okay, I'll pass the witness.
20       MR. QUINTANA: That's all the questions I
21 have.
22       (Deposition concluded)
23
24
25
```

## Page 6-

```
1        SIGNATURE OF ELISEO GARZA ROBLES
2     I have read the foregoing transcript of my
3  deposition and it is a true and accurate record of my
4  testimony given on AUGUST 24, 2000, except as to any
5  corrections I have listed on page 62 herein.
6
7              ELISEO GARZA ROBLES
8
9
10 THE STATE OF TEXAS
11 COUNTY OF _____
12      SUBSCRIBED AND SWORN TO BEFORE ME, the
13 undersigned authority on this the      day of
14      , 2000.
15
16            Notary Public in and for
17            The State of Texas
18 My commission expires:
19
20
21
22
23
24
25
```

## Page 62

```
1  ELISEO GARZA ROBLES - ERRATA SHEET
   Reasons for changes: (1) Clarify the record
2      (2     ) Conform to the facts
3      (3     ) Correct transcription errors
4  PAGE LINE  CHANGE FROM/CHANGE TO      REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25     ELISEO GARZA ROBLES
```

## Page 6

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION
3  FLOR ESTELLA BRIONES,    X
   INDIVIDUALLY AND AS      X
4  REPRESENTATIVE OF THE    X
   ESTATE OF JOSE CUELLAR   X
5               X  C.A. NO. B-99-195
   VS.          X
6               X
   THE CITY OF SANTA ROSA,  X
7  ET AL        X
8        REPORTER'S CERTIFICATE
9     I, MAUREEN STINGLEY, Certified Court
   Reporter, certify that the witness, ELISEO GARZA
10 ROBLES, was duly sworn by me, and that the deposition
   is a true and correct record of the testimony given by
11 the witness on AUGUST 24, 2000; that the deposition was
   reported by me in stenograph and was subsequently
12 transcribed under my supervision.
13    I FURTHER CERTIFY that I am not a
   relative, employee, attorney or counsel of any of the
14 parties, nor a relative or employee of such attorney or
   counsel, nor am I financially interested in the action.
15    WITNESS MY HAND on this the      day of
16      , 2000.
17
18      MAUREEN STINGLEY, CSR NO. 691
        Expiration Date: 12/31/00
19      Bryant & Stingley, Inc.
        2010 East Harrison
20      Harlingen, Texas  78550
21
22
23
24
25
```